# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

COLIN HENDERSON and WENDE KELSEY,

    Plaintiffs,

vs.

STATE FARM FIRE AND CASUALTY COMPANY,

    Defendant.

No. C21-90-LTS-KEM

**MEMORANDUM OPINION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

This matter is before me on a motion (Doc. 22) for summary judgment filed by defendant State Farm Fire and Casualty Company (State Farm). Plaintiffs Colin Henderson and Wende Kelsey (the Homeowners) filed a resistance (Doc. 23) and State Farm filed a reply (Doc. 27). Oral argument is not necessary. *See* Local Rule 7(c).

## II. PROCEDURAL HISTORY

The Homeowners filed this action in Iowa District Court for Linn County on August 9, 2021. Doc. 7. Count I asserts that State Farm breached an insurance contract. Count II asserts that State Farm acted in bad faith by failing to pay benefits under that contract. Count III requests declaratory judgment and injunctive relief pursuant to Iowa law and the appraisal clause in the insurance contract. The parties now agree that Count III is moot. Doc. 22-1 at 13; Doc. 23 at 21.

On September 30, 2021, State Farm removed the case to this court based on diversity jurisdiction under 28 U.S.C. § 1332 and supplemental jurisdiction under 28 U.S.C. § 1441. Doc. 1. Trial is set to begin January 30, 2023.

### III.   SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case.  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Thus, "the substantive law will identify which facts are material."  *Id.*  Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not.  *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question."  *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248).  Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial."  *Anderson*, 477 U.S. at 248–49.  The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue."  *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323).  Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there

is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376–77 (8th Cir. 1996).

## IV. RELEVANT FACTS

The following facts are undisputed for purposes of State Farm's motion, except when indicated otherwise. At all relevant times, the Homeowners resided at a property in Cedar Rapids, Iowa, that was covered by a State Farm insurance policy (the Policy). Doc. 23-1 at 1, ¶¶ 1-2. On August 10, 2020,[1] a windstorm hit Cedar Rapids and caused damage to the property. *Id.* at 1-2, ¶ 3. Three days later, the Homeowners submitted a claim to State Farm regarding the storm damage. *Id.* at 2, ¶ 4. Soon thereafter, State Farm Claim Specialist Tony Swindoll spoke with the Homeowners and State Farm Field Adjuster Jason Wilson set up a time to inspect the property. *Id.* at 2, ¶¶ 5-6. State Farm listed Swindoll as the claim owner for the Homeowners. Doc. 25 at 5, ¶ 89. Swindoll

---

[1] The parties state the storm occurred in 2022, but this appears to be a typo.

3

works remotely from Mississippi by reviewing electronic documents and photos. *Id.* at 5, ¶ 85. He did not adjust the Homeowners' claim in person. *Id.* at 5, ¶ 88. The Homeowners note that Swindoll had no opinion regarding the qualifications or experience of the field adjuster who inspected the property in person. *Id.* at 5, ¶ 89.

On September 4, 2020, Wilson inspected the home in the presence of plaintiff Wende Kelsey. Doc. 23-1 at 2, ¶ 7. At this first inspection, he:

> found minor wind damage affecting on shingle on the roof, which was approximately five years old; no damage to the front or right elevation; some missing vinyl siding and fascia on the rear elevation; loose siding that needed to be reset on the left elevation; cracked ceiling texture in the interior living room ceiling; moderate damage to the 25 year old garage roof and paint on every elevation; damage to a fence gate; and damage to the gas grill that had blown over in the storm.

*Id.* Following Wilson's inspection, he advised Kelsey of the claim estimate total, taking into account application deductibles and depreciation. *Id.* at 3, ¶ 8. On September 15, 2020, State Farm paid the Homeowners $1,806.85 for damage to the garage and $490.41 for damage to personal property. *Id.* at 3, ¶ 9.

After this first adjustment and payment, the Homeowners "retained contractor, Jonathan Pugsley of DHI roofing after he traveled from St. Louis to Cedar Rapids, Iowa, looking for clients, went through the [Homeowners'] neighborhood, and approached the [Homeowners] regarding the damage to the Property." *Id.* at 4, ¶ 12. On October 22, 2020, Kelsey contacted Swindoll regarding repairs made to the fence and Pugsley's estimate for other damage to the property. *Id.* at 3-4, ¶ 11. Kelsey submitted the invoice for the fence, the estimate, and photos on the next day. *Id.* at 4, ¶ 13. The following day, Swindoll reviewed the additional information, revised State Farm's original claim estimate and issued a supplemental payment to the Homeowners of $3,822.68 for damage to the house, garage and fence. *Id.* at 4, ¶¶ 14-15.

On October 26, 2020, two days after receiving a supplemental payment from State Farm, Pugsley sent State Farm an estimate for a total roof replacement with supporting

documentation. *Id.* at 5, ¶ 16. The Homeowners agree that they "relied on Mr. Pugsley's opinion with regard to the scope of the damage to their Property and used Mr. Pugsley to communicate with State Farm on their behalf." *Id.* at 5. ¶ 17. The day after receipt of this additional claim, Swindoll "reviewed the total roof estimate and photos sent by DHI Roofing and noted that he saw no creasing or unsealed tabs in the photos of the roof, that the shingles appeared to be in better than average condition, and that there was possibly one shingle that was wind damaged." *Id.* at 6, ¶ 19.

Swindoll forwarded the information to his team leader to decide if State Farm should perform a second inspection of the Property. *Id.* On October 28, a State Farm team leader reviewed the new information and determined "that the roof was not very old, in good condition, and should be able to be repaired, and therefore determined a second inspection was not warranted." *Id.* at 6, ¶ 20. A week later, Swindoll called the Homeowners and told Kelsey that State Farm would not perform a second inspection and that he would review an estimate for siding. *Id.* at 6, ¶ 21. At this point, the Homeowners understood that State Farm believed the roof was repairable and did not need fully replaced. *Id.* at 6-7, ¶ 22.

On November 9, 2020, DHI Roofing emailed State Farm, stating that the roof was "un-nailable" and it would be unable to perform the repair State Farm proposed. *Id.* at 7, ¶ 23. The Homeowners note that Pugsley came to this conclusion because regulations in the Iowa Administrative Code require asphalt shingles to be fastened to "solidly sheathed decks," and since "the sheathed surface is missing . . ., the repairs cannot be done." *Id.* The same day, Pugsley called State Farm and State Farm explained that it had found no new damage to the roof that warranted a new inspection but was reviewing the additional siding documentation. *Id.* at 7, ¶ 24. Pugsley sent State Farm additional photos of the roof, which Swindoll reviewed on November 13, 2020. *Id.* at 8, ¶¶ 25-26. Swindoll noted they were the same photos sent previously and concluded that one photo showed a damaged shingle that Pugsley claimed was wind damage but appeared to Swindoll to actually be wear and tear. *Id.* at 8, ¶ 26. He also reviewed the Homeowners'

5

siding estimate and determined State Farm's original estimate for siding damage was incorrect. *Id.* at 8, ¶ 27. At this point, he approved another field inspection for the home's siding and approved a second roof inspection if the field adjuster thought it was necessary. *Id.* Several days after this determination, Swindoll contacted Kelsey about the second inspection. *Id.* at 9, ¶ 28.

On November 23, 2020, State Farm field adjuster Justin Essick reinspected the home with Kelsey and Pugsley present. *Id.* at 9, ¶ 30. Essick noted that he "found one additional wind damaged shingle on the left slope and one missing tab which he concluded could be due to foot traffic," along with "signs of wind that pulled the drip edge up and may have caused a ridge cap to tear." *Id.* Essick did not recommend replacing the roof but told Pugsley that it could submit photos of roof-damage if it caused additional damage during repair. *Id.* Pugsley cut off a piece of the home's siding for Essick to send out to determine whether any matching siding was available. *Id.*

The next day, Essick mailed the siding sample. *Id.* at 10, ¶ 31. Pugsley also took his own siding sample "and submitted it to ITEL Laboratories, Inc., which uses proprietary technology to test, identify, price and match materials for insured property." Doc. 25 at 3, ¶ 75. The ITEL report states, "the manufacturing of [the Homeowners'] original siding had been discontinued but offered a potential similar match that might be available." *Id.* at 3, ¶ 77.

On November 25, 2020, Pugsley contacted State Farm for an update "and advised a State Farm representative that in order to repair the ridge caps, additional shingles will have to be removed, and, therefore, replaced." *Id.* at 7, ¶ 96. The Homeowners also assert that Pugsley expressed "his concerns regarding gaps great than ¼" in the dwelling roof decking;" however, State Farm denies this claim because the citation the Homeowners list in support does not address gaps larger than ¼" in roof decking. *Id.* at 7, ¶ 97; Doc. 22-6 at 61.

Shortly after the second inspection, Essick revised State Farm's estimate for additional shingles and repair of the ridge caps and drip edge and State Farm issued a

6

supplemental payment of $119.75 on December 7, 2020. Doc. 23-1 at 10, ¶¶ 32-33. Essick spoke to plaintiff Colin Henderson about the estimate revision, siding availability, the supplemental payment and remaining depreciation. *Id.* at 10, ¶ 32. When State Farm issued the additional payment, it also sent a letter regarding matching siding availability and contact information for the siding distributor. *Id.* at 10, ¶ 33.

On December 9, 2020, Pugsley sent an email to State Farm asking it to "replace all of the decking on the dwelling roof due to the spaced decking." *Id.* at 10-11, ¶ 34; Doc. 22-6 at 83. On December 14, 2020, Swindoll reviewed this email and noted that the two inspections showed only one shingle had been damaged and "there was no reason why that one shingle could not be replaced with the current deck." Doc. 23-1 at 10-11, ¶ 34. He also noted that State Farm had addressed the roof-replacement issue with DHI Roofing multiple times. *Id.* The next day, Pugsley sent another message regarding total-roof replacement. *Id.* at 11, ¶ 35. Swindoll spoke to Kelsey about the roof, stating:

> that both inspections found minimal shingle damage, that the second inspector determined the roof could be easily repaired with the current decking, and that although DHI Roofing does not agree with State Farm's determination, it would not be replacing the entire roof on the dwelling due to two or three wind damaged shingles.

*Id.* Swindoll also spoke to Pugsley to explain that State Farm would not replace the entire roof. *Id.* at 12, ¶ 36.

The day after Swindoll explained State Farm's position to both Kelsey and Pugsley, Pugsley spoke to Team Manager Andy Merkle. *Id.* at 12, ¶ 37. Merkle's notes reflect that Pugsley called to discuss replacing the entire roof due to "spaced decking," and Merkle responded "that the roof does not have spaced decking, but plank decking and as such had a nailable surface, that the shingles had been replaced 10-12 years ago with the same decking, and that there would be no issue with replacing three shingles on the plank decking." *Id.* Around this time, Pugsley told the Homeowners that Swindoll "was frustrating to deal with." *Id.* at 12, ¶ 38. Following this interaction, Pugsley "contacted the Chief Building Inspector of Cedar Rapids to inquire about building codes

7

regarding gaps in roof decking." Doc. 25 at 8, ¶ 103. On December 23, 2020, Pugsley sent the information he received to State Farm. *Id.* at 8, ¶ 104.

On January 8, 2021, Pugsley was advised that the company State Farm uses to match siding did not carry the Homeowners' siding. *Id.* at 9, ¶ 105. He emailed State Farm the same day to advise that he was unable to obtain replacement siding. Doc. 23-1 at 12, ¶ 39. Pugsley sent an email to Swindoll several days later, requesting siding replacement for the entire home because he could not find suitable matching siding for the damaged section of siding. *Id.* at 13, ¶ 40. A State Farm team leader reviewed the matching siding claim on January 13, 2021, and found three distributors that had the Homeowners' siding available. *Id.* at 14, ¶ 43.

The next day, Team Manager Merkle spoke with Henderson. *Id.* at 14, ¶ 44. He notified Henderson that State Farm found matching siding distributors and again explained that State Farm believed the damaged roof shingles could be repaired without replacing the entire roof. *Id.* Swindoll spoke with the siding distributors and confirmed they had matching siding available, then emailed the distributor contact information and siding availability to Henderson and DHI Roofing . *Id.* at 14, ¶ 45. Several days after sending this email, Swindoll called Pugsley to notify him that he had emailed siding information and Pugsley stated he would check his email. *Id.* at 14-15, ¶ 46.

The next contact between State Farm and Pugsley occurred on March 1, 2021, when Pugsley spoke with State Farm Claim Specialist Serena Wood. *Id.* at 15, ¶ 47. Wood noted that Pugsley "requested the siding be replaced instead of repaired as the available new siding would probably not match the siding on the dwelling." *Id.* According to her notes, he "also stated the roof was not repairable due to granular loss and that the replaced shingles on the roof would not match the current shingles." *Id.* Wood's notes reflect that she advised Pugsley which distributors had matching siding available "and that any difference in the shingles would need to be addressed after the repair is complete and Mr. Pugsley submitted photos and documentation for State Farm to review." *Id.* The Homeowners allege that Pugsley advised State Farm that all of their

8

"siding had to be completely replaced as the new siding would not likely match due to the color of the weathered siding already on [the Homeowners'] dwelling." Doc. 25 at 9, ¶ 106. State Farm denies this assertion because the portion of the appendix the Homeowners cite as support does not address weathered siding color. *Id.*

On April 5, 2021, Henderson visited his insurance agent, Heath Kilpatrick, and stated "that he was not happy with Mr. Swindoll after Mr. Pugsley had expressed to Mr. Henderson that he did not care to continue working with Mr. Swindoll because he was rude and overdemanding." Doc. 23-1 at 15, ¶ 48. That same day, one of Kilpatrick's employees contacted State Farm to report that the Homeowners were not happy with Swindoll as their claim adjuster. *Id.*, ¶ 49. Swindoll called Kilpatrick "and explained the [Homeowners] were unhappy with State Farm's decision, that [Homeowners'] contractor had been very hard to deal with and stated that management had been involved with this claim and the decisions made." *Id.* at 16, ¶ 50.

Kilpatrick then left a voicemail with Henderson to notify him that he had spoken with State Farm about Henderson's concerns. *Id.*, ¶ 51. State Farm Team Manager Rena Strohmeier called the Homeowners on April 7, 2021, and eventually spoke with Henderson on April 9, 2021. *Id.*, ¶¶ 52-53. Henderson asked Strohmeier for a third inspection of the roof because he disagreed with State Farm's determination that the roof did not need to be replaced, to which Strohmeier replied that State Farm would not change its conclusion unless the contractor found further damage. *Id.*, ¶ 53.

At some point in 2021, the Homeowners filed a complaint against State Farm with the Iowa Insurance Division. *Id.* at 17, ¶ 54; *see* Doc. 22-6 at 93-98. The Division responded on June 25, 2021, stating that "it appeared State Farm was following the terms and conditions of the Policy and [the Division was] unable to get involved in deciding the extent of damage or the amount of settlement appropriate for a claim." Doc. 23-1 at 16, ¶ 55; Doc. 22-6 at 99-100. It also stated that, if the Homeowners "have a factual dispute as to the determinations made by State Farm," then "[t]he proper forum to resolve this factual dispute would be a court of law." Doc. 22-6 at 99.

9

On August 2, 2021, the Homeowners' counsel sent a letter to State Farm requesting an appraisal of their claim pursuant to the Policy. Doc. 23-1 at 16, ¶ 56; Doc. 22-6 at 101-02. The Homeowners also requested an extension from State Farm regarding the Policy's one-year limitations period for filing actions. Doc. 25 at 9-10, ¶¶ 109-11. State Farm denied this request. *Id.* at 10, ¶ 112. The Homeowners then filed their state court action against State Farm on August 9, 2021. Doc. 23-1 at 16, ¶ 57.

In response to the Homeowners' appraisal request, State Farm sought "a detailed, itemized estimate outlining [the Homeowners'] scope of damages and items in dispute pursuant to the Policy." *Id.* at 17, ¶ 58. The Homeowners note "that there is no such requirement in the Appraisal Clause in Plaintiffs' Policy drafted by State Farm." *Id.* at 17-18, ¶ 58. The Appraisal Clause states, "[a]t least 10 days before demanding appraisal, the party seeking appraisal must provide the other party with written, itemized documentation of a specific dispute as to the amount of the loss, identifying separately each item being disputed." Doc. 22-5 at 42, ¶ 4. On August 27, 2021, Pugsley sent State Farm an estimate listing the total replacement cost value as $41,049.70. Doc. 23-1 at 18, ¶ 59.

The appraisal report was sent to the parties on March 14, 2022. *Id.*, ¶ 60. The appraisal made separate findings as to both the actual cash value (ACV) and the replacement cost value (RCV) of the losses for the dwelling and additional structures. *Id.* The sum of the ACV findings was $16,155.48, while the sum of the RCV findings was $21,069.59. *Id.* The appraisal used the RCV findings in stating a total award of $21,069.59. *Id.* The Homeowners state that the appraisal panel found that the roof should be replaced. Doc. 25 at 11, ¶ 117. State Farm admits this fact but clarifies that the appraisal did not find that the roof decking should be replaced as well. *Id.*; Doc. 23-2 at 8-18.

Pursuant to the appraisal award, "State Farm issued payment in the amount of $9,096.20 for the difference in the actual cash value awarded by the appraisal and the payments already paid to [Homeowners]" on March 15, 2022. Doc. 23-1 at 18-19, ¶

10

61. State Farm's cover letter advised the Homeowners that they had to comply with the Policy's requirements to obtain full replacement cost indemnity. *Id.* at 20, ¶ 65. As of the date of State Farm's summary judgment motion, the Homeowners had not provided any documentation that they had repaired the property. *Id.* at 21, ¶ 66. However, on September 16, 2022 (over a year after filing this action), the Homeowners produced repair invoices. *Id.* The invoices reflect that the Homeowners paid to have their garage roof, dwelling roof and siding repaired and restored on August 1, 2022. Doc. 25 at 11-12, ¶¶ 118; Doc. 23-2 at 19-21. The Homeowners state that they are still trying to repair their property because they "could not make any major repairs as the vast majority of payments were not received until after the Appraisal Award." Doc. 25 at 12, ¶¶ 119-20. They also state that they "still cannot find a good match for their siding and are concerned that they will end up with a 'polka dot house.'" *Id.* at 12, ¶ 121.

The applicable Policy provisions are as follows:

- Actual cash value (ACV) is defined as "the value of the damaged part of the property at the time of loss, calculated as the estimated cost to repair or replace such property, less a deduction to account for pre-loss depreciation." Doc. 22-5 at 22, ¶ 1.

- The Loss Settlement Provision begins by stating that State Farm "will settle covered property losses according to the following." *Id.* at 39. Under both the Similar Construction and Common Construction provisions of the Replacement Cost Loss Settlement, the Policy states that, "until actual repair or replacement is completed, *we* will pay only the ***actual cash value*** of the damaged part of the property, up to the applicable limit of liability shown in the ***Declarations***, not to exceed the cost to repair or replace the damaged part of the property."[2] *Id.* at 39-40. The Policy states that State Farm will pay the replacement cost value (RCV) when the repair or replacement is actually completed. *Id.* Further, the

---

[2] Emphasis in Policy quotations are from the original text.

policyholder "must complete the actual repair or replacement of the damaged part of the property within two years after the date of loss, and notify *us* within 30 days after the work has been completed" to receive additional replacement cost value payments. *Id.*

- The Policy creates duties for the Homeowners. *Id.* at 41. Specifically, it states that they "must cooperate with *us* in the investigation of the claim and also see that the following duties are performed: . . . as often as *we* reasonably require: (1) exhibit the damaged property; (2) provide *us* with any requested records and allow *us* to make copies." *Id.* (emphasis in original).

- The Appraisal Clause states:

If *you* and *we* fail to agree on the amount of loss, either party can demand that the amount of the loss be set by appraisal. Only *you* or *we* may demand appraisal. A demand for appraisal must be in writing. *You* must comply with **SECTION 1 – CONDITIONS, Your Duties After Loss** before making a demand for appraisal.

*Id.* at 42. The Policy mandates:

In all instances the written report of agreement will be itemized and state separately the ***actual cash value***, replacement cost, and if applicable, the market value of each item in dispute. The written report of agreement will set the amount of the loss of each item in dispute and will be binding upon *you* and *us*.

*Id.* The Policy also notes that the policyholders and State Farm "do not waive any rights by demanding or submitting to an appraisal, and retain all contractual rights to determine if coverage applies to each item in dispute." *Id.* at 43. Further, "[a]ppraisal is only available to determine the amount of loss of each item in dispute," and the appraisers do not have authority to decide questions of fact, law, coverage, or other contractual issues. *Id.* Finally, the Loss Payment provision of the Appraisal Clause states that State Farm "will adjust all losses with *you*. . . . Loss will be payable 60 days after *we* receive *your* proof of loss and: . . . there is a filing of an appraisal award with *us*." *Id.*

12

- The Policy includes a Right to Inspect provision. *Id.* at 53. It states that State Farm has the right but is "not obligated to perform the following: (1) make inspections and surveys of the ***insured location*** at any time; (2) provide ***you*** with reports on conditions ***we*** find; or (3) recommend changes. Any inspections, surveys, reports, or recommendations relate only to insurability and the premiums to be charged." *Id.* State Farm does not "warrant that conditions comply with laws, regulations, codes, or standards." *Id.* The Right to Inspect provision "applies to ***us*** and to any rating, advisory, rate service, or similar organization that makes insurance inspections, surveys, reports, or recommendations on ***our*** behalf." *Id.*

## V. ANALYSIS

### A. *Count I – Breach of Contract*

State Farm seeks summary judgment on the breach of contract claim because it has already issued a full payment of the actual cash value (ACV) portion of appraisal award and the Policy requires the Homeowners to repair and replace the damaged property in order to receive the additional replacement cost value (RCV) portion of the appraisal. Doc. 22-1 at 10-13.

#### 1. *Standards*

To prevail on a breach of contract claim under Iowa law,[3] a plaintiff must prove:

> (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that [plaintiff] has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach.

---

[3] Neither party contends that the law of any other state applies in this diversity action.

*Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998) (citing *Iowa-Illinois Gas & Elec. Co. v. Black & Veatch*, 497 N.W.2d 821, 825 (Iowa 1993)). A party breaches a contract when, without legal excuse, the party fails to perform any promise that forms a whole or a part of the contract. *Id.* (citing *Magnusson Agency v. Public Entity Nat'l Co. Midwest*, 560 N.W.2d 20, 27 (Iowa 1997)).

Because "insurance policies are contracts between the insurer and insured, [they] must be interpreted like other contracts, the objects being to ascertain the intent of the parties." *Talen v. Employers Mut. Cas. Co.*, 703 N.W.2d 395, 407 (Iowa 2005). "If the language of the policy is unambiguous, . . . that intent is determined by what the policy itself says." *Monroe County v. International Ins. Co.*, 609 N.W.2d 522, 525 (Iowa 2000). "An ambiguity exists when, after application of our relevant rules of interpretation, a genuine uncertainty results as to which of two or more meanings is proper." *Am. Fam. Mut. Ins. Co. v. Petersen*, 679 N.W.2d 571, 576 (Iowa 2004), *amended on denial of reh'g* (May 6, 2004). "When two reasonable interpretations exist, the policy is construed most favorably to the insured." *Id.* However, courts "will not give a strained or unnatural reading to the words of the policy to create ambiguity where there is none." *Morgan v. Am. Family Mut. Ins. Co.*, 534 N.W.2d 92, 99 (Iowa 1995), *overruled on other grounds by Hamm v. Allied Mut. Ins. Co.*, 612 N.W.2d 775, 784 (Iowa 2000).

The party claiming entitlement to coverage under the policy must prove compliance with its terms. *Am. Guar. & Liab. Ins. Co. v. Chandler Mfg. Co.*, 467 N.W.2d 226, 228 (Iowa 1991); *Bruns v. Hartford Accident & Indem. Co.*, 407 N.W.2d 576, 579 (Iowa 1987); *Henschel v. Hawkeye–Security Ins. Co.*, 178 N.W.2d 409, 415 (Iowa 1970); *Henderson v. Hawkeye–Security Co.*, 106 N.W.2d 86, 91 (Iowa 1960). The party claiming coverage may meet this burden of proof by showing: (1) substantial compliance with the condition precedent; (2) the failure to comply was excused or waived; or (3) the failure to comply was not prejudicial to the insurer. *Am. Guar.*, 467 N.W.2d at 228; *Henderson*, 106 N.W.2d at 92. Under Iowa law, waiver is "the

14

intentional relinquishment of a known right." *Huisman v. Miedema*, 644 N.W.2d 321, 324 (Iowa 2002) (quoting *State v. Hallum*, 606 N.W.2d 351, 354 (Iowa 2000)). Further, an insured's violation of a condition precedent is presumed to be prejudicial to the insurer. *Met–Coil Sys. Corp. v. Columbia Cas. Co.*, 524 N.W.2d 650, 658 (Iowa 1994); *Am. Guar.*, 467 N.W.2d at 228. However, the insured may rebut the presumption if it shows the lack of prejudice by satisfactory evidence. *Met–Coil*, 524 N.W.2d at 658; *Western Mut. Ins. Co. v. Baldwin*, 137 N.W.2d 918, 925 (Iowa 1965).

When parties engage in an appraisal, courts must "decide coverage questions, but the appraisers' determination of the factual cause and monetary amount of the insured loss is binding on the parties absent fraud or other grounds to overcome a presumption of validity." *Walnut Creek Townhome Assoc. v. Depositos Ins. Co.*, 913 N.W.2d 80, 87 (Iowa 2018). "But this does not mean the court is free to disregard the appraisal award as to factual disputes that may be dispositive of coverage questions." *Id.* at 91.

### 2. Discussion

Both parties agree that the appraisal award controls. Doc. 22-1 at 11; Doc. 23 at 16. State Farm argues that because the Policy requires the policyholder to make repairs or replacements before State Farm must make a replacement cost value payment, the Homeowners are not entitled to the additional RCV amounts listed in the appraisal award. Because State Farm has already paid the ACV portion of the appraisal award, and the Homeowners did not provide State Farm with documentation that they have conducted further repairs or replacements according to the award, State Farm concludes it has not breached the parties' contract. Doc. 22-1 at 13.

The Homeowners respond that "State Farm cannot treat a lawsuit and Appraisal process as the time to finally properly adjust a loss; such conduct constitutes a breach of its insurance contract." Doc. 23 at 15. They allege that State Farm's "delay constitutes a breach of contract, which in addition to direct damages (covered by the Appraisal Award), there are owed consequential damages that were foreseeable and reasonably

15

resulting from the breach." *Id.* Specifically, the Homeowners cite to the Loss Settlement Policy provision to support their argument that State Farm still owes the remaining RCV award of $4,910.11. *Id.* at 17. They claim that provision's language stating, "[l]oss will be payable 60 days after we receive your proof of loss and . . . there is a filing of an appraisal award with us" includes the RCV award. *Id.* at 17-18. They read the appraisal provision as separate from the provisions governing RCV payment because those terms and conditions "are applicable to a standard loss adjustment between an insurer and insured when the Policy is being complied with, but not when an Appraisal has to be demanded because the parties could not agree as to the value of a covered loss." *Id.* at 19.

The Homeowners also argue that if I find the Loss Settlement provision to be ambiguous, I should construe it in their favor. *Id.* at 20. Finally, they state that they have complied with the Loss Settlement provision regardless because in September 2022, they provided documentation to State Farm of repairs they made in August of 2022. *Id.* Based on this alleged breach of contract, the Homeowners state that their consequential damages of "having to hire experts, pay for a lawsuit where the insurer would not agree to extend the timeline, and such other damages flowing naturally and proximately from the breach" are foreseeable because State Farm unreasonably delayed and denied Policy benefits it owed to them. *Id.* at 16.

State Farm responds by pointing out that the Homeowners are essentially arguing that "the appraisal process voids other provisions of the Policy." Doc. 27 at 6. It contends that the appraisal award does not eliminate the Homeowners' duty under the Policy to repair or replace property in order to receive the RCV payment. *Id.* State Farm argues that the Policy must be read as a whole and that the Appraisal provision's requirement to list both ACV and RCV values supports its reading of the Policy. *Id.* at 7. Further, State Farm states that it is currently "considering repair estimates produced by [the Homeowners] on September 16, 2022, to determine if additional payments from

16

the $4,914.11 appraisal award RCV should be paid."[4]  *Id.* at 2, n.1.  As for the Homeowners' consequential damages claim, State Farm cites to Iowa law holding that the proper remedy for breach of an insurance contract by delay or denial of benefits is the amount due under the contract.  *Id.* at 8 (citing to *Brown Twp. Mut. Ins. Ass'n v. Kress*, 330 N.W.2d 291, 298 (Iowa 1983)).

> The Iowa Supreme Court has explained RCV provisions as follows:
>
> [w]hat is contemplated under a replacement cost provision is that, ordinarily, actual cash value will be less than replacement cost.  The insurer will first pay the lesser amount—actual cash value.  Upon completion of replacement [within the prescribed time period], the insurer will pay the difference between actual cash value and replacement cost."

*Pierce v. Farm Bureau Mut. Ins. Co.*, 548 N.W.2d 551, 554 (Iowa 1996).  The Iowa Supreme Court addressed similar appraisal and RCV language in *Walnut Creek Townhome Association v. Depositors Insurance Company*, 913 N.W.2d 80, 86, 94 (Iowa 2018) (remanded on separate grounds).  The Court summarily affirmed the lower court's decision that the insured was not entitled to the replacement cost appraisal award because the Policy required the policyholder to actually repair or replace damaged items and the insured did not show it completed repairs for soft metal damage.  *Id.*

Insurers in Iowa must use substantially equivalent appraisal provisions.  *Id.* at 87-88.  In fact, the RCV provisions in *Walnut Creek* and this case are very similar.  *Compare id.* at 88 with Doc. 22-5 at 42.  Thus, under Iowa law, the Homeowners were entitled to recover the RCV portion of the appraisal award only if they provided State Farm with documentation that they had actually completed the necessary replacements or repairs.  Their argument that State Farm was required to pay the RCV portion within 60 days of

---

[4] The Homeowners do not allege State Farm has denied this claim.  Additionally, State Farm agrees that it is bound by the appraisal award, which includes the RCV determination.  The current legal issue before me is simply whether the Homeowners were entitled to this payment 60 days after the appraisal award, regardless of whether they repaired or replaced any items covered by the appraisal award.

the appraisal award – even if no repairs or replacements had occurred – is contrary to the Policy and to Iowa law. As a matter of law, the Homeowners have not shown that State Farm breached the Policy. As such, State Farm is entitled to summary judgment on Count 1.

### B.    Count II – Bad Faith

#### 1.    Standards

To prevail on a first party bad faith insurance claim pursuant to Iowa law, a plaintiff must show "(1) that the insurer had no reasonable basis for denying benefits under the policy and, (2) the insurer knew, or had reason to know, that its denial was without basis." *Thorton v. American Interstate Insurance Company*, 897 N.W.2d 445, 461-62 (Iowa 2017) (quoting *United Fire & Cas. Co. v. Shelly Funeral Home, Inc.*, 642 N.W.2d 648, 657 (Iowa 2002)). The first element is objective and the second element is subjective. *Bellville v. Farm Bureau Mut. Ins. Co.*, 702 N.W.2d 468, 473 (Iowa 2005).

With regard to the first element, "[a] reasonable basis exists for denial of policy benefits if the insured's claim is fairly debatable either on a matter of fact or law." *Bellville*, 702 N.W.2d at 473. This issue may be decided as a matter of law. *Id.* A claim is "fairly debatable when it is open to dispute on any logical basis . . . . Stated another way, if reasonable minds can differ on the coverage-determining facts or law, then the claim is fairly debatable." *Bellville*, 702 N.W.2d at 473. Because the first element's focus is on whether there was a debatable issue, it is not dispositive if the insurer's position was ultimately incorrect. *Id.* Instead, the dispositive question is whether a fairly debatable claim existed. *Id.* When "an objectively reasonable basis for denial of a claim *actually exists*, the insurer cannot be held liable for bad faith as a matter of law." *Id.* at 474 (emphasis in original). Courts do not weigh the evidence an insurance company considered; they determine simply whether evidence existed to justify the company's denial of the policyholder's claim. *Id.*

Even if a policyholder shows that the insurance company lacked an objective reasonable basis to deny the claim, bad faith liability attaches only if the insurance company "knew or should have known that the basis for denying its insured's claim was unreasonable." *Id.* "An insurer's negligent or sub-par investigation or evaluation of a claim is relevant to the fact finder's determination of whether the insurer should have known its denial lacked a reasonable basis." *Id.* However, an improper investigation alone "is not sufficient cause for recovery if the insurer in fact has an objectively reasonable basis for denying the claim." *Id.* (cleaned up).

### 2. Discussion

The only discernible disputed material facts the Homeowners have identified concern the quality of the inspections and the repair determinations State Farm made. Otherwise, both parties agree as to the timeline and events, but disagree regarding the reasonableness of State Farm's repair determination.

The Homeowners allege that State Farm conducted a "subpar" investigation that essentially amounted to "no investigation at all." This statement is completely belied by the record and State Farm's statement of facts admitted by the Homeowners. *See Hartnagel*, 953 F.2d at 395 (explaining that an issue of material fact is genuine if it has a real basis in the record). The Homeowners agreed that State Farm completed two in-person inspections and revised its estimates multiple times after the Homeowners provided new information or invoices. Further, State Farm repeatedly told the Homeowners that it would review any new evidence of damage and continue to revise its estimates if it determined a revision was necessary. Merely disagreeing with State Farm's conclusions is not a factual dispute. Thus, the Homeowners have not identified any genuine issues of material fact with a basis in the record and summary judgment is appropriate for their claim of bad faith.

As a matter of law, the Homeowners cannot meet the first objective bad faith element that State Farm had no reasonable basis for valuing their claim based on repair

19

rather than replacement of the roof and siding. "In many cases, a directed verdict or summary judgment for the insurer dismissing the bad-faith claim may be appropriate because *some* evidence existed to justify its denial as a matter of law." *Thornton v. American Interstate Ins. Co.*, 897 N.W.2d 445, 465 (Iowa 2017) (emphasis in original). While the Homeowners disagree with State Farm's conclusions, that does not mean State Farm's conclusions were not justified by any evidence.

Regarding the roof, State Farm's first inspection found minimal damage, as did its review of additional photographs Pugsley sent it as part of his request for a full roof replacement. Swindoll and a State Farm team leader both reviewed Pugsley's request and additional documentation and both concluded that the Homeowners' relatively-new roof was repairable. Even so, State Farm conducted a second roof inspection when an in-person inspector went to the property to review further evidence of siding damage. The second inspector did find some additional evidence of wind damage, but ultimately agreed with Swindoll and the team leader that the roof damage was repairable. Based on this second inspection, State Farm again revised its estimate for the roof and issued a supplemental payment. State Farm also conducted two inspections regarding the siding. It continuously reviewed the Homeowners' issues with finding matching siding and repeatedly communicated information to Pugsley about siding distributors that had suitable siding available.

The Homeowners do not contest this timeline of events, but rely on the final appraisal award as evidence that State Farm's investigation of their claims was subpar. However, a disagreement between policyholders and an insurance company's valuation of claims is the precise purpose of the appraisal clause. Such a disagreement does not automatically resolve in favor of a policyholder, as "[a]n insurance company is not obligated to disregard the opinion of its own expert in favor of the insured's expert's opinion." *Bellville*, 702 N.W.2d at 477 (cleaned up). A similar disagreement occurred in *Hallmark Specialty Insurance Company v. Phoenix C & D Recycling, Inc.*, 999 F.3d 563, 568 (8th Cir. 2021). In that case, the insurance company relied on an accounting

20

firm's report when it first decided to pay only a portion of the amount an insured claimed. *Id.* at 566, 568. The company notified the insured that its determination was subject to change upon receipt of additional financial information from the insured, but the insured "simply reasserted its belief that it had provided sufficient information and that, based on the financial information provided, it was entitled to a larger payment." *Id.* at 569. The insured did not give an alternate calculation or explain why the company's calculation was too low. *Id.* Thus, the court found that the company had an objectively reasonable basis to deny the claim, even if the accounting firm's report included any inaccuracies, because "an imperfect investigation, standing alone, is not sufficient cause for recovery if the insurer in fact has an objectively reasonable basis for denying the claim." *Id.* (cleaned up).

The insured also argued that the company exhibited bad faith for delayal of benefits when it made only a partial payment due to the company's interpretation of the policy requiring the insured to actually repair or replace items in the RCV category. *Id.* The company did later pay full benefits for the items at issue, but the payment was delayed because the insured had not repaired or replaced them when the company first issued a payment for those items. *Id.* The court noted that the insurance company had to have a reasonable basis to deny a claim *at the time of denial*. *Id.* at 568 (quoting *Seastrom v. Farm Bureau Life Ins. Co.*, 601 N.W.2d 339, 346 (Iowa 1999)) (emphasis added). It held that the insurance company's interpretation of its own policy and Iowa law regarding RCV payments was an objectively reasonable basis to deny the insured's full demand at the time of denial. *Id.* at 569.

Here, the Homeowners make essentially the same arguments, based on their characterization of State Farm's investigation and alleged delayal of benefits. However, the undisputed facts show that State Farm performed multiple inspections and reviews of documentation the Homeowners provided. Even if the Homeowners are correct that State Farm did not adequately investigate the repairability of their roof, that is not enough to prove bad faith if the insurer has an objectively reasonable basis to deny the claim. The

fact that State Farm relied on its own experts' opinions, instead of Pugsley's opinion, does not constitute bad faith. State Farm's determination that the roof could be repaired instead of being fully replaced was an objectively reasonable basis to deny the Homeowners' request at the time. The fact that the appraisal award later determined otherwise is irrelevant, as the question is whether a debatable issue existed at the time of the denial, not if the insurer's position turned out to be incorrect. *Bellville*, 702 N.W.2d at 473.

As a matter of law, the question of whether the Homeowners' roof was repairable or had to be replaced was a debatable issue that constituted an objectively reasonable basis for State Farm's denial of the Homeowners' claim. State Farm is entitled to summary judgment as to Count II.

## VI. CONCLUSION

For the reasons set forth herein:

1. State Farm's motion (Doc. 22) for summary judgment is **granted** as to all claims.

2. This action is hereby **dismissed** and judgment **shall enter** in favor of State Farm and against plaintiffs.

3. The trial of this case, currently scheduled to begin January 30, 2023, is hereby **cancelled**.

4. The Clerk of Court shall **close this case**.

**IT IS SO ORDERED.**

**DATED** this 20th day of December, 2022.

_____
Leonard T. Strand, Chief Judge

22